**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEWSPIN SPORTS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-345 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| ARROW ELECTRONICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff NewSpin Sports, LLC ("Plaintiff" or "NewSpin") brings suit against Defendant

Arrow Electronics, Inc. ("Defendant" or "Arrow") for breach of contract, breach of implied

covenant of good faith and fair dealing, breach of warranty, fraud, unjust enrichment, and negligent

misrepresentation arising out of NewSpin's purchase of goods and services from Arrow.  On July

26, 2017, Judge Der-Yeghiayan granted Arrow's motion to dismiss NewSpin's original complaint

in its entirety as untimely.  See [26], [27].  Judge Der-Yeghiayan subsequently denied NewSpin's

motion for reconsideration and for leave to file an amended complaint.  See [48].  While those

decisions were on appeal, Judge Der-Yeghiayan retired and the case was reassigned to this Court.

See [54].  On December 3, 2018, the Seventh Circuit affirmed in part and reversed in part the

dismissal of NewSpin's complaint, reversed the denial of NewSpin's motion for leave to amend,

and remanded for further proceedings.  See [79].[1]  NewSpin filed an amended complaint [85] on

February 22, 2019.  Currently before the Court is Arrow's motion to dismiss the amended

complaint [88].  For the following reasons, Arrow's motion to dismiss [88] is granted in part and

---

[1] The Seventh Circuit's opinion was docketed as entry [79].  It is reported as *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293 (7th Cir. 2018), but the Court will continue to cite to the docket rather than to the reported decision.

denied in part. NewSpin's claims for unjust enrichment is dismissed. NewSpin's claim for fraud is also dismissed, but NewSpin is granted leave to amend that claim by May 7, 2020. Arrow's motion to dismiss is denied as to the three contract-based claims. Arrow's motion to dismiss NewSpin's negligent misrepresentation claims is denied without prejudice and subject to renewal based on the supplemental briefing ordered below. This case is set for status hearing on May 13, 2020 at 9:00 a.m.

## I.    Background[2]

Plaintiff NewSpin was founded in 2009 by Angelo Papadourakis and is or was in the business of providing technology products that help golfers, tennis players, and other sports enthusiasts analyze and improve their swings. In 2010, NewSpin began searching for electronic components manufacturers to produce and assemble its flagship product called "SwingSmart." SwingSmart is a sensor module that attaches to sports equipment for the purpose of providing analysis and key metrics about swing technique, speed, and angle.

In 2010 and 2011, Defendant Arrow and its Advanced Manufacturing Support Services Group ("AMSS") learned that NewSpin was seeking to engage a new manufacturer and distributor. According to the amended complaint, Arrow and AMSS aggressively pursued NewSpin to induce it to contract with Arrow and its AMSS division for manufacturing and assembly management services. Arrow represented to NewSpin that it could leverage its supplier relationships and industry contacts on NewSpin's behalf. Arrow also represented to NewSpin that it would engage, on NewSpin's behalf, a high quality fabrication house to successfully manufacture components for NewSpin and a high quality subassembly house to assemble and install the components into a

---

[2] For purposes of Arrow's motion to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's amended complaint. See [85]; *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

working electronic device that would successfully implement NewSpin's design specifications and manufacturing requirements. Arrow's AMSS division would manage, oversee, and have responsibility for the manufacturing and assembly process. Arrow represented that one of the advantages of utilizing Arrow and its AMSS division was that NewSpin would not have to locate, hire, and manage a component manufacturer and subassembly house on its own.

Sales people from Arrow and its AMSS division spent months of persistent efforts to aggressively promote and sell Arrow's materials and manufacturing management services to NewSpin. During the many meetings between the parties, NewSpin laid out the requirements for SwingSmart as well as NewSpin's manufacturing needs, and Arrow repeatedly and (according to NewSpin) falsely misrepresented its own expertise in manufacturing similar devices and its capability to efficiently and economically manufacture working SwingSmart electronic assemblies through its subcontractors to meet NewSpin's needs. These meetings and misrepresentations (among others) occurred at the following times and places and involved the following people:

- An October 27, 2010, meeting at Arrow's corporate office in Santa Clara, California, between Arrow management and representatives, including Joe Story, Madhuri Akkenepalli, and Elisia Vitales, and Tom McClaughry, Chief Technology Officer of NewSpin;

- A November 3, 2010 meeting at Arrow's Santa Clara office between Arrow's Story, Marty Townsend and McClaughry;

- A February 21, 2011 meeting at Arrow's Orange County corporate office between Arrow's Story, Townsend, Rob Platter, Sylvia Leal, Jim Offineer, Mike Webb and NewSpin's representatives McClaughry, Papadourakis and Ed Verdino;

- A February 22, 2011 meeting at the Los Angeles Country Club between Townsend, Verdino and Papadourakis and a meeting that same day in Foothill Ranch, California between Arrow's Story, Offineer, Moe Ghasen and NewSpin's McClaughry;

- On May 25 and May 26, 2011, Jeff Low, an Arrow Sales Manager for the West Coast, met with Verdino and Papadourakis at an Arrow/Texas Instruments sponsored corporate event in Frisco, Texas during which Arrow further represented

that it had the ability and experience to provide proper materials and manufacturing management services for NewSpin, it had expertise in the manufacturing process, and that it had the understanding and experience in dealing with issues and problems common to manufacturing components. On May 26, 2011, Arrow's field sales representative Glenn Vargas also met with McClaughry in Santa Clara, California for the same purpose;

- On June 3, 2011, Arrow's Vargas, Platter, and a representative from the contract manufacturer, Gary Walker, met with McClaughry at Walker's office in San Jose, California, to discuss the process for assembling, testing and repairing the components and assemblies for which Arrow and its AMSS division would be responsible for managing the manufacture and assembly in the Materials and Manufacturing Management contract.

Based on Arrow's representations during these meetings, NewSpin believed that Arrow knew how the SwingSmart product had to function, understood NewSpin's requirements for the components of the SwingSmart product, and understood and had the experience and expertise to capably manage the manufacturing and assembly process for such components. Arrow's management and sales representatives assured NewSpin that Arrow and its AMSS division: (i) had extensive experience providing manufacturing and assembly management services; (ii) had the resources in place to provide those services to NewSpin; (iii) had provided manufacturing and assembly management services to other customers for similar components and products; and (iv) understood common problems with manufacturing and assembling such components and products and how to deal with them effectively when they arose. Based on these representations, NewSpin entered into a Materials and Manufacturing Management Agreement ("Agreement") with Arrow. (The Agreement is attached as Exhibit 1 to the amended complaint, see [85-1].)

Section 1.1 of the Agreement obligated Arrow to: (i) procure components, (ii) review and accept NewSpin's specifications for the manufacture, assembly and testing of components, (iii) engage a third-party subassembly house for the manufacture and assembly of products or boards, (iv) manage the implementation of change orders, (v) inspect products and boards prior to

shipment to ensure conformance with NewSpin's specifications, and (vi) test products and boards pursuant to testing procedures provided by NewSpin.

In late 2011, NewSpin sent its first purchase order of 7,500 assemblies to Arrow under which Arrow was to provide its management services and procure certain component parts. In mid-2012, Arrow made an initial shipment of 100 assemblies to NewSpin in Illinois and California, which appeared to fulfill NewSpin's requirements. NewSpin then approved the purchase of 7,400 additional assemblies—the balance of the first order—in the belief that they would conform to the first 100 assemblies. However, the amended complaint alleges, Arrow used a different fabricator for the remaining 7,400 assemblies and did not disclose this fact to NewSpin. NewSpin later discovered that those assemblies had a high failure rate.

As NewSpin gradually learned of defective assemblies through the complaints of its SwingSmart customers, NewSpin notified Arrow of the problems with the products it had delivered. In response, Arrow assured NewSpin that it had solutions. These solutions included surrounding the components on the board with epoxy and baking them, and changing the substrate material of the boards from the original Isola to Polyimidide and then to Arlon. Arrow's solutions failed to eliminate the problems.

In reliance on Arrow's assurances that their successive solutions would fix the problems with Arrow's products, NewSpin continued to issue purchase orders to Arrow for additional components well into 2013. These included, among others, an order for 890 kits on January 30, 2013 for $53,400; an order for 110 kits on February 7, 2013 for $6,600; an order for 110 kits on February 20, 2013 for $2,750; an order for 330 kits on March 7, 2013 for $9,322.50; an order for 890 kits on March 7, 2013 for $28,480; and an order for 3,000 electrical assemblies on April 3, 2013 for $88,500. To the extent Arrow shipped such orders, they were also largely defective

despite Arrow's repeated assurances that it either had or would resolve problems with the functionality of the assemblies it shipped. NewSpin also spent hundreds of thousands of dollars in promotional videos and other marketing efforts in reliance on Arrow's representations and purported skill in manufacturing management, and NewSpin had no choice but to rely on Arrow's representations and services to rapidly fulfill the growing numbers of orders that NewSpin's marketing efforts generated.

Of the 7,500 units Arrow initially delivered, only 3,219 were able to be shipped to customers, due to what NewSpin would later discover were defects in the manufacturing process that was managed by Arrow. Of the 3,219 units shipped, 697 were wholly inoperable. Of the 7,500 SwingSmart units in the initial build, 4,281 units were inoperable or defective, a 57% failure rate. NewSpin was forced to resupply SwingSmart units to some of its customers at its own cost because of defects in the assemblies that Arrow supplied.

The failures continued with the units Arrow shipped to NewSpin in 2013, even after Arrow stated that their solutions fixed the issue. The defects in the assemblies Arrow delivered, which NewSpin alleges resulted from Arrow's poor manufacturing management, included but were not limited to flux-infiltrated switches, punctured batteries, unsecured batteries, electrostatic discharge damaged computer processors, early and latent ball grid array failures, solder ball failures, and pad cratering.

In May 2013—after numerous unsuccessful attempts by NewSpin to get Arrow to address its failures, and continued deliveries of units which were defective—NewSpin hired and paid for a manufacturing expert, DfR Solutions, to review the project. DfR Solutions identified pad cratering as one of the primary reasons for the defective assemblies, an issue that (according to NewSpin) Arrow would have been aware of and could easily have avoided if it had expertise in

providing manufacturing and assembly management services, as it represented to NewSpin. NewSpin alleges that Arrow should have been aware of pad cratering as a common manufacturing problem in projects of this type and should have been able to fix this and other issues. DfR Solutions correctly identified the fix that solved the pad cratering problem. Their solution was to use a $50 jig to hold the boards in place as they went through the assembly process. NewSpin ordered 12 jigs at a cost of $600.

Apart from delivering defective assemblies, Arrow never delivered $136,217.41 worth of components to NewSpin, despite billing NewSpin for them. These components, which included but were not limited to cases, plastics, and batteries, were ordered by Arrow from third parties on NewSpin's behalf as "No Credit, No Return," meaning that NewSpin would purportedly be responsible for accepting the delivery of and paying for the NC/NR components (the "NC/NR Components"). Despite billing NewSpin $136,217.41 for the unused and undelivered NC/NR Components, Arrow has never delivered the NC/NR Components to NewSpin, and NewSpin has never received them.

NewSpin alleges that as a result of Arrow's fraud, deceit, and breaches, it has incurred at least $598,488 in out of pocket damages related to non-conforming services and defective assemblies. NewSpin was also forced to incur ongoing costs associated with customer support efforts, module testing, repair and logging, as well as legal fees and costs associated with bringing this lawsuit. In addition, NewSpin incurred more than $400,000 for marketing, advertising and promotions, which NewSpin was forced to abandon due to Arrow's alleged failures and NewSpin's resulting inability to sell reliable products. Moreover, the amended complaint alleges, NewSpin's financial resources were largely destroyed paying for the products Arrow delivered, which could not be sold or used due to their extreme rate of defects. The amended complaint

alleges that Arrow's misconduct has irrevocably damaged NewSpin's brand equity, reputation, vendor relationships, and early entrance into the marketplace, causing NewSpin to essentially cease operations, including efforts to produce and sell SwingSmart.

Based on these facts, the amended complaint asserts claims for breach of contract, breach of implied covenant of good faith and fair dealing, breach of warranty, fraud, unjust enrichment, and negligent misrepresentation.

## II.      Legal Standard

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

## III.     Analysis

### A.      Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, and Breach of Warranty

The first three counts of NewSpin's amended complaint are contractual claims for breach of contract, breach of implied covenant of good faith and fair dealing, and breach of warranty. Under New York law, which governs in this case (see [79] at 8, 20), a plaintiff bringing a breach of contract claim must allege "(1) a contract; (2) performance of the contract by one party; (3)

breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co*., 152 F.3d 162, 168 (2d Cir. 1998)). "The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement." *1357 Tarrytown Road Auto, LLC v. Granite Props., LLC*, 37 N.Y.S.3d 341, 343 (App. Div. 2016). "A successful claim of a breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty." *Reed v. Pfizer, In*c., 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012) (applying New York law).

The Seventh Circuit held on appeal that the Agreement between the parties is predominately a contract for the sale of goods and, therefore, is subject to the UCC's four-year statute of limitations. It further determined that because the contractual claims in NewSpin's original complaint alleged only a mid-2012 breach, the claims were untimely when NewSpin brought suit in January 2017. However, the court of appeals added that the district court should have allowed NewSpin an opportunity to amend these claims to allege further defective deliveries in 2013, which "could be timely if they relate back to the original 2017 complaint." [79] at 30, n.6. The Seventh Circuit left it to the district court on remand "to assess, in the first instance, whether the amended pleading sufficiently addresses this timeliness issue." *Id*.

NewSpin's amended complaint, like its original complaint, contains claims for breach of contract, breach of implied covenant of good faith and fair dealing, and breach of warranty. Specifically, in Count I of the amended complaint, NewSpin alleges that Arrow breached the Agreement by failing to provide goods and services in accordance with the Agreement and NewSpin's specifications and by failing to deliver certain components to NewSpin. In Count II, NewSpin alleges that Arrow breached the duty of good faith and fair dealing imposed by every

contract by failing to provide services and goods in accordance with the Agreement, including: (i) failing to properly manage the manufacturing and subassembly process, (ii) failing to properly manage the implementation of change orders, (iii) failing to inspect products and boards prior to shipment to ensure conformance with NewSpin's specifications, (iv) failing to test products and boards pursuant to testing procedures provided by NewSpin, (v) failing to provide working goods; (vi) choosing improper, unfit, or substandard subcontractors, (vii) failing to deliver certain components for which NewSpin was charged, (viii) failing to remedy defective components, and (ix) failing to advise NewSpin of problems it discovered in the manufacturing process. In Count III, NewSpin alleges that Arrow breached its warranty under § 2 of the Agreement by providing components that were not manufactured or assembled pursuant to NewSpin's specifications, providing components that were not free from defects in workmanship (including flux-infiltrated switches, punctured batteries, unsecured batteries, electrostatic discharge damaged computer processors, early and latent ball grid array failures, failed solder balls and pad cratered boards), and failing to repair, replace or refund them upon notice and demand.

In its motion to dismiss, Arrow argues that all three of these claims must be dismissed because they involve alleged breaches relating to new purchase orders that do not relate back to the original complaint and are therefore untimely. According to Arrow, "[t]he 2013 purchase orders and deliveries featured in the Amended Complaint were not alleged—or even implied—in the original Complaint," and NewSpin "did not suggest that any post-2012 transactions might be at issue until August 2017, when it moved for reconsideration of the Complaint's dismissal and for leave to plead additional breaches." [89] at 6. Arrow contends that "[t]hese new allegations pertain to separate conduct and separate transactions and do not relate back to the breaches alleged in the Complaint, so they are now time-barred." *Id*. at 2.

After reviewing the parties' arguments and the original and amended complaints, the Court concludes that Arrow's alleged defective deliveries in 2013 relate back to the original 2017 complaint and, therefore, are not time-barred.  Pursuant to Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when: … the amendment asserts a claim … that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  "The central inquiry under Rule 15(c) is whether the original complaint 'gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one.'"  *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc*., 902 F.3d 735, 741 (7th Cir. 2018) (quoting *Santamarina v. Sears, Roebuck & Co*., 466 F.3d 570, 573 (7th Cir. 2006)).

As the Seventh Circuit recognized, the original complaint expressly referred only to the delivery of defective goods in mid-2012.  Nonetheless, the original complaint alleged more generally that Arrow breached the Agreement "by failing to provide components in accordance with the Agreement and in accordance with NewSpin's specifications" and "by failing to deliver components to" NewSpin.  [1] at 6, ¶ 28.  According to the amended complaint, NewSpin notified Arrow of the problems with the components it delivered and was repeatedly assured by Arrow into 2013 that it had solutions.  Given the parties' extensive dealings between the time NewSpin discovered that Arrow's components were defective and the time NewSpin filed suit, it is difficult to imagine how Arrow could be surprised that the mid-2012 delivery was not the only one at issue in this lawsuit.  Further, the original complaint notified Arrow that $598,488 in orders were at issue—a number that (according to NewSpin and not contested by Arrow) included all of NewSpin's orders, not just the one delivered in mid-2012.  See *id.*, ¶ 20.  The original complaint

also notified Arrow that $136,217.41 in non-delivered goods were at issue. *Id.* at 5-6, ¶¶17, 21. The Court therefore agrees with NewSpin that Arrow "cannot be surprised that any order relating to defective goods supplied pursuant to … Agreement is at issue." [92] at 4.

In addition, NewSpin's motion for reconsideration, filed on August 23, 2017, expressly sought leave to file an amended complaint alleging that NewSpin "continued to issue purchase orders to Arrow for additional components well into 2013." [92] at 5; see also [31] at 8. Thus, there can be no doubt that Arrow was on notice of the full scope of the conduct "attempted to be set out" in the original complaint, Fed. R. Civ. P. 15(c)(1)(B), within months of the filing of the original complaint. None of the case law cited by Arrow involved even remotely similar facts. *Skinner v. Shirley of Hollywood*, 723 F. Supp. 50, 54 (N.D. Ill. 1989), involved application of the statute of limitations to a defendant's successive failures to pay the plaintiff commission, not Rule 15(c). *Hamilton v. O'Connor Chevrolet, Inc.*, 2003 WL 22953337, at *1, 3 (N.D. Ill. Dec. 12, 2013), involved two separate retail installment contracts, while the claims alleged in this case relate to a single contract. In *Central Mortg. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 2012 WL 3201139, at *17-18 (Del. Ch. Aug. 7, 2012), a plaintiff mortgage service company purchased rights to service more than 20,000 individual loans to home buyers. The complaint asserted that the defendant seller had allegedly misrepresented facts relating to 47 of those loans. After the dismissal of claims concerning the 47 loans, the plaintiff tried unsuccessfully to file an amended complaint adding claims for 12,000 more individual loans and 218 agency loans. By contrast, this case involves a single defendant, a single contract, and breaches arising out of repeated deliveries of the same type of allegedly defective and non-conforming goods. For these reasons, the Court denies Arrows' motion to dismiss the contractual claims (Counts I, II, and III) as untimely.

## B.     Fraud

Count IV of the amended complaint alleges a claim for fraud.  To state a claim for fraud under New York law, a plaintiff must allege that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004).

On appeal, the Seventh Circuit held that although Judge Der-Yeghiayan properly determined that the unjust enrichment and negligent misrepresentation claims were duplicative of the breach of contract claims and therefore also time-barred, NewSpin had "sufficiently alleged a separately-actionable fraud in Counts IV and V."  [79] at 20.  The court explained that, "[t]aking NewSpin's allegations as true, as we must at this stage, NewSpin has alleged Arrow materially misrepresented the currently-existing state of its own experience and materials, Arrow knew these misrepresentations were untrue, Arrow made these statements to induce Arrow to enter into the Agreement, and NewSpin relied upon these misrepresentations in doing so."  *Id.* at 27.  The court concluded that "[t]hese allegations are sufficient to maintain NewSpin's fraud claims independent of its contract-based claims."  *Id*.  However, it directed this Court on remand to "address whether the fraud claims as pled in the ultimately operative complaint meet this heightened pleading standard" set forth in Rule 9(b).  *Id.*, n.5; see also Fed. R. Civ. P. 9(b).

In the fraud claim contained in its amended complaint, NewSpin alleges that Arrow made numerous misrepresentations of material fact and failed to disclose material facts to NewSpin for the purpose of inducing NewSpin to enter into the Agreement.  In particular, NewSpin alleges, Arrow's representatives misrepresented that Arrow and its AMSS division: (i) had extensive

experience providing manufacturing and assembly management services, (ii) had the resources in place to successfully provide those services to NewSpin, (iii) had provided manufacturing and assembly management services to other customers for similar components and products, and (iv) understood common problems with manufacturing and assembling such components and products and how to deal with them effectively when they arose. NewSpin alleges that each of those misrepresentations was a false statement of fact. NewSpin further alleges that in meetings held October 27, 2010, November 3, 2010, February 21, 2011, February 22, 2011, May 25-26, 2011, and June 3, 2011, Arrow representatives Madhuri Akkenepalli, Sylvia Leal, Jeff Low, Christopher Miller, Jim Offineer, Rob Platter, Joe Story, Marty Townsend, Glenn Vargas, Elisia Vitales, and Mike Webb told NewSpin representatives Tom McClaughry, Angelo Papadourakis, and Ed Verdino that Arrow not only had the ability and resources to successfully provide materials and manufacturing management services for NewSpin, but was already set up to provide those services and had extensive knowledge of the manufacturing process and understanding and experience in dealing with issues and problems common to manufacturing components. In particular, Arrow represented that it had provided materials and manufacturing management services for similar PCB assemblies and was familiar with and understood typical manufacturing issues with all PCB manufacturing and management including those with flux-infiltrated switches, batteries, computer processors, ball grid arrays, and solder balls. In those same meetings and on those same dates, Arrow misrepresented that it had the skillset to provide, and had successfully provided, similar manufacturing and assembly management services for other customers. NewSpin alleges that Arrow knew that its misrepresentations of material fact were untrue when made, knew that its components did not meet NewSpin's written specifications, and made such misrepresentations and omissions to induce NewSpin to enter into the Agreement. NewSpin alleges that it justifiably

relied upon Arrow's misrepresentations and omissions in entering into the Agreement. If Arrow had truthfully disclosed the relevant facts to NewSpin, NewSpin alleges, it would never have purchased the services or signed the Agreement. Finally, NewSpin alleges that it could not have known of the falsity of Arrow's representations, and was not damaged by them until after Arrow had repeatedly delivered defective goods to NewSpin and demonstrated an inability to understand or fix its manufacturing management problems.

Arrow moves to dismiss the fraud claim on two grounds, which the Court will address in reverse order. To begin, Arrow contends that NewSpin cannot show reasonable reliance on Arrow's alleged misrepresentations. According to Arrow, "[a]s a matter of law, sophisticated parties cannot show reasonable reliance unless they investigated the alleged misrepresentation, and NewSpin does not allege it conducted any inquiry." [89] at 10 (citing *James River Multistrategy Fund, L.P. v. Motherrock, L.P.*, 2014 WL 3361181, at *2 (N.Y. July 7, 2014)). This is not an accurate statement of *James River* (which was decided on summary judgment, not a motion to dismiss) or the duty to investigate. *James River* explained that "a sophisticated party cannot establish that it entered into an arm's length transaction in justifiable reliance on an alleged misrepresentation *if* that party failed to make use of the means of verification that were available to it, such as reviewing files of the adversary." *Id*. at *3 (emphasis added). At this stage of the case, there is no way for the Court to determine whether NewSpin had any way to verify Arrow's alleged misrepresentations concerning its experience, knowledge, and skillsets. The amended complaint alleges that NewSpin could not have known of the falsity of Arrow's representations until after Arrow had repeatedly delivered defective goods to NewSpin and demonstrated an inability to understand or fix its manufacturing management problems. The Court must accept this allegation as true for purposes of assessing the motion to dismiss.

In further support of its argument concerning reliance, Arrow argues that NewSpin could not have reasonably relied on Arrow's alleged misrepresentations because the Agreement contains disclaimer and merger clauses. Arrow asserts that Sections 2.2, 8.3, and 8.6 of the Agreement, taken together, "bar reliance on any extra-contractual representations 'relating to the subject matter of th[e] Agreement.'" [93] at 9 (quoting Agreement § 8.6).

Accepting Arrow's argument would require the Court to ignore the Seventh Circuit's determination that NewSpin's fraud claim alleges that Arrow "owed it a duty distinct from the duty to perform under the Agreement." [79] at 24. According to the Seventh Circuit, NewSpin sufficiently alleged that Arrow breached a legal duty separate from the duty to perform under the contract, because it misrepresented present facts collateral to the Agreement, concerning its own experience in the field and past dealings with other customers besides NewSpin. *Id*. at 26. In particular, NewSpin explains, "the misrepresentations were about other facts which were never disclaimed including that Arrow '(i) had extensive experience providing manufacturing and assembly management services, (ii) had the resources in place to successfully provide those services to NewSpin, (iii) had provided manufacturing and assembly management services to other customers for similar components and products, and (iv) understood common problems with manufacturing and assembling such components and products and how to deal with them effectively when those arose.'" [92] at 8-9 (quoting First Amended Complaint, ¶48). Arrow offers no explanation as to why these representations should not be considered to "relat[e] to the subject matter of th[e] Agreement." [93] at 9.

Arrow's other argument in support of dismissing the fraud claim is more persuasive. Arrow asserts that NewSpin's "allegations fail Rule 9(b)'s particularity requirement because they fail to state what, specifically, Arrow said or why Arrow's general representations about its

experience and skills were false." [89] at 2. According to Arrow, while "NewSpin alleges that Arrow made misrepresentations about its skills, experience, and resources during six meetings among more than a dozen people at various locations in California," it "does not allege the details: what specifically Arrow said; which of its representatives said it; when and where in California it was said; and how it was communicated—orally in person, over the phone, in writing, or by some other means." [89] at 9.

Based on its review of the amended complaint, the Court concludes that NewSpin's fraud claim comes close, but nonetheless fails, to satisfy the Rule 9(b) requirement that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy the heightened pleading standard of Rule 9(b), the circumstances [of the alleged misrepresentation] must be pleaded in detail. The who, what, when, where, and how: the first paragraph of any newspaper story." *Blankenship v. Pushpin Holdings, LLC*, 2015 WL 5895416, at *7 (N.D. Ill. Oct. 6, 2015) (internal quotation marks omitted; citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Rule 9(b) specifically requires alleging with particularity: "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id*. (quoting *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc*., 772 F.3d 1102, 1106 (7th Cir. 2014)).

As the above summary of NewSpin's claim indicates, NewSpin alleges that specific representatives of Arrow—Madhuri Akkenepalli, Sylvia Leal, Jeff Low, Christopher Miller, Jim Offineer, Rob Platter, Joe Story, Marty Townsend, Glenn Vargas, Elisia Vitales, and Mike Webb—told specific representatives of NewSpin—Tom McClaughry, Angelo Papadourakis, and Ed Verdino—at multiple meetings at particular locations, [85] at 3-5, on particular dates— October

27, 2010, November 3, 2010, February 21, 2011, February 22, 2011, May 25-26, 2011, and June 3, 2011—that Arrow "had provided materials and manufacturing management services for similar PCB assemblies and was familiar with and understood typical manufacturing issues with all PCB manufacturing and management" and that Arrow "had the skillset to provide, and had successfully provided, similar manufacturing and assembly management services for other customers," when in fact these statements were not true. *Id*. at 14. The Court would not characterize these as "blanket" allegations of fraud, as Defendant does. [93] at 7.

Nonetheless, the amended complaint does not tie specific misrepresentations to specific representatives of Arrow. The Seventh Circuit recently cautioned that "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Cornielsen v. Infinium Capital Management, LLC*, 916 F.3d 589, 599 (7th Cir. 2019); see also *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) ("because fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud'" (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)). Although this case involves a single corporate defendant, the concept of fair notice is the same. Plaintiff has attributed multiple false statements to nearly a dozen of Defendant's representatives, without identifying who made a particular statement or why that statement was false, making it difficult for Defendant to investigate and defend against Plaintiff's allegations. See *Gensler v. Strabala*, 764 F.3d 735, 737 (7th Cir. 2014) (in cases alleging fraud, the court expects the "complaint to allege with particularity the nature of the grievance—what [the defendant] said and why it is false"). Therefore, the Court grants Defendant's motion to dismiss the fraud claim. However, since Plaintiff does provide most of the details required by Rule 9(b), the Court grants Plaintiff leave to file a second amended

complaint which provides the additional detail required to support its fraud claim, to the extent it
is able to do so consistent with this opinion.

### C.    Unjust Enrichment

Count V of the amended complaint alleges a claim for unjust enrichment.  As the Seventh
Circuit explained on appeal,

> [U]njust enrichment … is available only in unusual situations when, though the
> defendant has not breached a contract or committed a recognized tort,
> circumstances create an equitable obligation running from the defendant to the
> plaintiff."  *Corsello v. Verizon N.Y.*, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012).
> Generally, in New York, "[a]n unjust enrichment claim is not available where it
> simply duplicates, or replaces, a conventional contract or tort claim."  *Id*.  "[A]
> claim for unjust enrichment is not duplicative of a breach of contract claim where
> the plaintiff alleges that the contracts were induced by fraud."  *Pramer S.C.A. v.
> Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 161 (App. Div. 2010).  But when the unjust
> enrichment claim only seeks to replicate a contract or tort claim, it must be
> dismissed.  See *Walter H. Poppe Gen. Contracting, Inc. v. Town of Ramapo*, 721
> N.Y.S.2d 248, 249 (App. Div. 2001) (unjust enrichment claim properly dismissed
> where "the damages sought are merely for breach of contract").

[79] at 21.

The Seventh Circuit affirmed the dismissal of NewSpin's original unjust enrichment claim
and rejected NewSpin's argument that the claim was not duplicative of the breach of contract claim
because NewSpin alleged that the contract was induced by fraud.  The court explained that the
complaint alleged that Arrow received $598,488 from NewSpin that it should not be allowed to
retain "despite delivering defective components to NewSpin"—which was "the same amount
NewSpin alleged it had paid Arrow for the allegedly defective components."  [79] at 21-22.  The
Seventh Circuit's decision forecloses the unjust enrichment claim plead in NewSpin's amended
complaint, as well, because that complaint, like the original complaint, alleges that it would be
unjust for Arrow to retain the amounts NewSpin paid Arrow under the Agreement.  Therefore,
Arrow's motion to dismiss the unjust enrichment claim is granted.

### D.       Negligent Misrepresentation

Count VI of the amended complaint alleges a claim for negligent misrepresentation. In New York, "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011).

The Seventh Circuit affirmed the dismissal of Plaintiff's original negligent misrepresentation claim based on the economic loss rule—the "jurisprudential principle that a plaintiff cannot recover in tort for purely economic losses caused by the defendant's negligence." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010). The court of appeals explained that "[i]n its negligent misrepresentation claim, NewSpin only alleges Arrow made misrepresentations regarding Arrow's component parts and their conformity to NewSpin's specifications." [79] at 23. The court concluded that because "[t]he only damages attributable to these misrepresentations are the same damages NewSpin would recover for its breach-of-contract claim"—"the amount it lost because of Arrow's defective delivery"—"NewSpin cannot recover for these purely economic losses." *Id*. at 23-24.

In its amended complaint, NewSpin has modified the negligent misrepresentation claim to focus on Arrow's alleged extracontractual misrepresentations concerning its experience, skillsets, and resources, as it does in its fraud claim. See [85] at 17-18. This addresses the pleading defect identified by the Seventh Circuit. Nonetheless, Arrow argues that this does not save the claim, because NewSpin still does not plead that it suffered any non-economic loss and because NewSpin fails to sufficiently allege a special privity-like relationship between it and Arrow.

As an initial matter, the Court notes that the state and federal courts in New York have not always applied the economic loss rule in a consistent manner, creating some confusion concerning whether a party can ever bring a negligent misrepresentation claim when the damages suffered are economic, as opposed to damages to the person or to property.  In *Wells Fargo Bank, N.A. v. HoldCo Asset Management, L.P.*, 2017 WL 2963501 (S.D.N.Y. July 11, 2017), the court explained:  "There appear to be, among New York courts and federal courts applying New York law, two versions of the rule in play.  The broad version of the doctrine restrict[s] plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains.  In such cases, plaintiffs alleging pecuniary loss may either recover for breach of contract (if they have a viable contractual claim) or not at all.  The narrower version of the doctrine precludes recovery in tort only where the damages suffered are of the type remediable in contract. In this formulation, a contracting party may not recover expectation damages in a tort action, but would not be barred from recovering tort-based damages—even if such damages stemmed from purely pecuniary loss."  *Id.* at *21 (internal quotation marks and citations omitted); see also *Travelers Cas. and Sur. Co.*, 734 F. Supp. 2d at 378 n.15 ("New York courts appear to disagree whether the term 'economic loss rule' should apply outside the context in which it first emerged, namely, product-liability suits against manufacturers); *N.Y. Methodist Hosp. v. Carrier Corp.,* 68 A.D.3d 830, 892 N.Y.S.2d 110, 111–12 (App. Div. 2d Dep't 2009) (setting forth and discussing the "economic loss doctrine" in the products-liability realm).  Some courts characterize the economic loss rule as "extend[ing] beyond" the products-liability context and 'limit[ing] the liability of providers of services as well as providers of products," including specifically in construction litigation. *Bristol–Myers Squibb, Indus. Div. v. Delta Star, Inc.,* 206 A.D.2d 177, 620 N.Y.S.2d 196, 199 (App. Div. 4th Dep't 1994). The New York Court of Appeals has admonished,

however, that the "economic loss rule" should not be used outside of the product-liability context, and that a "duty"-based analysis should be applied instead. *532 Madison Ave. Gourmet Foods v Finlandia Ctr., No. 84, 85, 95*, 96 N.Y.2d 280, 288 & n.1, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (N.Y. June 7, 2001) ("*Finlandia II*"). As demonstrated by the court's holding in that case, however, the decision as to which terminology to use appears to be of little practical importance, and courts routinely overlook the formal distinction. See, e.g*., Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 16 (2d Cir. 2000) ("*Hydro Investors*") (describing *Finlandia II* as "hav[ing] applied the economic loss rule" to bar plaintiff's recovery)").

The parties do not address whether the narrow or broad version of the rule should apply, but the viability of Count VI may well turn on that determination. If the broad version applies, the claim should be dismissed because all of the damages alleged by NewSpin involve economic losses, not personal or property injury. If the narrow version applies, the amended complaint is likely sufficient to proceed.

The Seventh Circuit discussed the economic loss rule as follows:

> In Count VII, NewSpin brings a claim for negligent misrepresentation. NewSpin alleges Arrow "made misrepresentations of material fact and failed to disclose material facts without reasonable care with knowledge that such misrepresentations ... would be relied upon by [NewSpin] in its business transaction with Arrow." The district court dismissed this claim based on both the four-year limitations period and the economic loss rule.

> In New York, "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104, 1109 (2011) (alteration in original) (quoting *308 *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 831 N.Y.S.2d 364, 863 N.E.2d 585, 587 (2007)).

> We need not decide if this claim duplicates NewSpin's contract claims because we agree the economic loss rule bars recovery. Under New York law, "inasmuch as the damages established by [a plaintiff] are properly characterized as

22

'economic loss' they are not recoverable in an action for tort based upon negligent misrepresentation." *Gen. Elec. Co. v. A.C. Towne Corp.*, 144 A.D.2d 1003, 534 N.Y.S.2d 283, 285 (1988); *see also Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 734 F.Supp.2d 368, 378 (S.D.N.Y. 2010) ("New York's economic loss doctrine is a jurisprudential principle that a plaintiff cannot recover in tort for purely economic losses caused by the defendant's negligence.").

In its negligent misrepresentation claim, NewSpin only alleges Arrow made misrepresentations regarding Arrow's component parts and their conformity to NewSpin's specifications. These misrepresentations solely relate to the subject matter of the Agreement, pursuant to which Arrow was to provide NewSpin with specific components. The only damages attributable to these misrepresentations are the same damages NewSpin would recover for its breach-of-contract claim: the amount it lost because of Arrow's defective delivery. NewSpin cannot recover for these purely economic losses. *See Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) ("While [plaintiff] has properly pled all of the elements required to state a cause of action for negligent misrepresentation, it has pled purely economic damages as a result of its reliance, thereby inviting application of New York's 'economic loss rule.' "); *cf. Ocean Gate Homeowners Assoc., Inc. v. T.W. Finnerty Prop. Mgmt., Inc.*, 83 N.Y.S.3d 494, 497, 163 A.D.3d 971 (2018) ("[W]here [a] plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." (alterations in original) (quoting *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1369 (1992))).

The district court thus properly dismissed NewSpin's negligent misrepresentation claim in Count VII.

[79] at 22-24.

This discussion does not resolve the matter of which version of the rule applies, for the court of appeals cited cases applying both versions. In *Travelers Casualty & Surety Co.*, 734 F. Supp. 2d at 378, the court explained that "New York's economic loss doctrine is a jurisprudential principle that a plaintiff cannot recover in tort for purely economic losses caused by the defendant's negligence." "Under this principle, the defendant is not liable to a plaintiff for the latter's economic loss *unless* there exists 'a special relationship that requires the defendant to protect against the risk of harm to plaintiff.'" *Id.* (quoting *Finlandia II*, 750 N.E.2d 1097) (emphasis added). "A limited exception to New York's barrier against recovery of economic loss exists …

for claims of negligent misrepresentation." *Id*. at 379. Nevertheless, "before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity." *Id*. at 379-80. This requires three showings: (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party of the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance. *Id*. at 380. *Travelers* thus appears to support application of the narrow version of the economic loss rule.

By contrast, in *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204 (S.D.N.Y. 2007), the plaintiff argued that its negligent misrepresentation claim was not barred by the economic loss rule because its claim was based on "duties independent of any contract, including the fiduciary duties ... not to conceal material information from and act against the interests of the person to whom it owes the duty." *Id*. at 220. The court rejected the argument, explaining that "[t]he fact that the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of Manhattan's breach of contract claims." *Id*. "It does not allow evasion of the economic loss rule, which presents a second, distinct barrier." *Id*. In order to "keep contract law from drown[ing] in a sea of tort," "New York courts restrict plaintiffs who have suffered 'economic loss,' but not personal or property injury, to an action for the benefits of their bargains." *Id.* (citing *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989)); see also *Weisblum v. Prophase Labs, Inc.*, 88 F.Supp.3d 283, 297 (S.D.N.Y. 2015) (same). Thus, "[i]f the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort." *Manhattan Motorcars*, 244 F.R.D. at

220; see also *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 472 (S.D.N.Y. 2016) ("When Plaintiffs, as is the case here, allege economic loss as an injury in a tort claim the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie." (internal quotation marks and citation omitted)); *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013) (same). Applying this rule, the court held that even though the plaintiff "properly pled all of the elements required to state a cause of action for negligent misrepresentation, it … pled purely economic damages as a result of its reliance" and therefore its claim for negligent misrepresentation must be dismissed. *Manhattan Motorcars*, 244 F.R.D. at 220. For present purposes, it seems evident that *Manhattan Motorcars* applied the broad version of the rule.

One Second Circuit case, which involved malpractice rather than a straight negligent misrepresentation claim, suggests that the narrower version of the rule may be more appropriate. In *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 17–18 (2d Cir. 2000), the appellate court explained:

> The record in the present case does not call for us to apply the economic loss rule to bar TPI's damages. The circumstances here indicate that TPI's professional malpractice claim is one sounding in tort and not a contractual dispute disguised as a tort. Although the parties may have entered into contracts governing some aspects of their relationship, the damages awarded below were for a harm distinct from those contracts, a harm arising out of the failure of Dunlevy and Stetson–Harza to provide proper estimates of energy output, adequately gauge the impact of government regulations, and more generally provide appropriate services. See *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Assoc. of Am.,* 259 A.D.2d 75, 83, 693 N.Y.S.2d 554 (N.Y.App.Div.1999) ("[I]n claims against professionals, '[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals ... may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.' ") (quoting *Sommer,* 79 N.Y.2d at 551, 583 N.Y.S.2d 957, 593 N.E.2d 1365) (first alteration added; *18 second alteration in original); *Robinson Redevelopment Co. v. Anderson,* 155 A.D.2d 755, 757, 547 N.Y.S.2d 458 (N.Y.App.Div.1989) ("We conclude that the contractual and professional relationship of plaintiff and defendants gave rise to two distinct wrongs, one

contractual and the other grounded in professional malpractice, recoverable at law."); *Commerce & Industry Ins. Co. v. Vulcraft, Inc.,* No. 97 Civ. 2578, 1998 WL 823055, at *12 (S.D.N.Y. Nov.20, 1998) (rejecting the application of the economic loss rule and stating that "[t]he premise for the third-party claim ... is in substance one for professional malpractice, and that obligation is distinct from any contract into which the parties may have entered").

While we recognize that some cases have applied the economic loss rule to bar recovery where the only loss claimed is economic in nature, see *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 62 (2d Cir.1984), and still others have applied that rule to professional malpractice cases, see *Joseph v. David M. Schwarz/Architectural Servs., P.C.,* 957 F. Supp. 1334, 1339–40 (S.D.N.Y.1997), the better course is to recognize that the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions. *See 17 Vista Fee Assocs.,* 259 A.D.2d at 83, 693 N.Y.S.2d 554 ("[T]he fact that 17 Vista suffered pecuniary losses only is of no significance in this malpractice claim against a professional. Many types of malpractice actions, such as those against an accountant or attorney, will frequently result in economic loss only.") (internal citations omitted); *Robinson Redevelopment Co.,* 155 A.D.2d at 757, 547 N.Y.S.2d 458 (stating that because "[m]ost malpractice claims against professionals 'regularly arise out of a contractual relationship and involve injury to property or pecuniary interests only,' " strict application of the economic loss rule to such claims "would eliminate the availability of malpractice claims against professionals such as architects where the damages are essentially pecuniary in nature") (quoting *Video Corp. of Am. v. Frederick Flatto Assoc., Inc.,* 85 A.D.2d 448, 451–52, 448 N.Y.S.2d 498 (1982)).

It is also worth noting the potential difficulty of dismissing a claim based on the absence of a special relationship. Arrow relies on *Kimmell v Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996), but that case can be read to support NewSpin's position, especially at the motion to dismiss stage. As the court recognized,

Since a vast majority of commercial transactions are comprised of … "casual" statements and contacts, we have recognized that not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care …. Rather, liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.

*Id.* In addition, the court noted that "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact," which turns on "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

Based on the foregoing discussion, the Court concludes that it needs the parties to give further consideration to—and perhaps to provide supplemental briefing on—the scope of the economic loss doctrine under New York law before it can make a sound determination on whether Count VI can proceed. For the moment, Arrow's motion to dismiss that count is denied without prejudice. If, after careful consideration of the applicable New York case law, Arrow wishes to pursue a renewed motion to dismiss Count VI, it may file a motion to that effect, along with a supporting brief, by May 7, 2020. The Court will set a briefing schedule on the motion, should it be filed, at the May 13 status hearing.

## IV.     Conclusion

For these reasons, Arrow's motion to dismiss the amended complaint [88] is granted in part and denied in part. NewSpin's claims for unjust enrichment are dismissed. NewSpin's claim for fraud is also dismissed, but NewSpin is granted leave to amend that claim by May 7, 2020. Arrow's motion to dismiss is denied as to the three contract-based claims. Arrow's motion to dismiss as NewSpin's negligent misrepresentation claims is denied without prejudice and subject to renewal based on the supplemental briefing ordered above. This case is set for status hearing on May 13, 2020 at 9:00 a.m.

Dated: March 23, 2020

Robert M. Dow, Jr.
United States District Judge